**ORIGINAL**  FILED

UNITED STATES COURT OF FEDERAL CLAIMS    AUG 5 2015

U.S. COURT OF FEDERAL CLAIMS

)
BAHRAM MECHANIC,                          )
                                          )
         Plaintiff,                       )
                                          )
v.                                        )      **15 - 834 C**
                                          )
THE UNITED STATES OF AMERICA,             )   CASE NO.: _____
                                          )
         Defendant.                       )
                                          )
                                          )

## COMPLAINT

Plaintiff, BAHRAM MECHANIC, a.k.a. "BAHRAM MECHANIC ESFAHANI," (hereinafter "Mr. Mechanic" or "Plaintiff") by and through his attorney[s] of record, as and for his Complaint against Defendant United States ("United States," "U. S. Government," or "Defendant"), hereby allege that the United States has taken and deprived him of his property without paying him just compensation in violation of the Takings Clause of the Fifth Amendment under the U.S. Constitution. Plaintiff alleges as follows:

### NATURE OF THE ACTION

1. This action challenges Defendant's action under Executive Orders 12170 (November 14, 1979), 12205 (April 7, 1980), 12211 (April 17, 1980), 12282 (January 23, 1981), 12613 (October 30, 1987), 12959 (May 9, 1995), 13059 (August 19, 1997) and 13599 (February 5, 2012), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. ("IEEPA"), and the Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560 ("ITSR") because they violate Plaintiff's rights under the Constitution of the United States.

RECEIVED
AUG 5 2015

1

2. In violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution, the United States has taken the property of Plaintiff in the form of his legally cognizable, pre-existing ownership interest (since 1973) in Faratel Inc. ("Faratel Iran"), a corporation located in Tehran, Iran.

## JURISDICTION

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1491(a)(1), the Tucker Act, because this action presents a claim against the United States premised upon a violation of the Takings Clause of Fifth Amendment of the U.S. Constitution.

4. Specifically, this action concerns the taking of private property without just compensation, in violation of the Takings Clause of the Fifth Amendment, which provides, in relevant part: "…nor shall private property be taken for public use, without just compensation." The Takings Clause of the Fifth Amendment is a money-mandating source of law for purposes of Tucker Act jurisdiction. See Jan's Helicopter Serv., Inc. v. F.A.A., F.3d 1299, 1309 (Fed. Cir. 2008).

## PARTIES

5. Plaintiff is a naturalized citizen of the United States, who currently resides in Houston, Texas. Plaintiff was born in Tehran, Iran on March 1, 1946, and lived in Iran until 1985 when he permanently moved to the United States. In 2010, Plaintiff became a naturalized citizen of the United States. Plaintiff's U.S. citizenship was granted with the U.S. Government's full knowledge that he held a pre-existing ownership interest in Faratel Iran.

6. Defendant is the United States, the actions of which deprived Plaintiff of valuable property without just compensation.

## STATUTORY AND REGULATORY FRAMEWORK: IRAN SANCTIONS

7. The International Emergency Economic Powers Act ("IEEPA"), enacted Dec. 28, 1977, authorizes the President of the United States to declare a national emergency with respect to "any unusual and extraordinary threat, which has its source in whole or in substantial part outside the United States, to the national security, foreign policy or economy of the United States." 50 U.S.C. § 1701(a). When the President has declared such an emergency, he:

> "may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise…block…regulate…nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States…."

50 U.S.C. § 1702(a)(1)(B). The primary U.S. federal governmental body responsible for administering U.S. sanctions laws and regulations against Iran is the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC"), which maintains various sanction programs and regulations against countries such as Iran.

8. In Executive Order 12170, issued on November 14, 1979, 44 Fed. Reg. 65729 ("E.O. 12170"), under the authority of, inter alia, IEEPA and the National Emergencies Act (50 U.S.C. § 1601, et seq.) ("NEA"), President Carter declared a national emergency due to the situation in Iran (the seizure of the American Embassy in Tehran) and the threat to the national security, foreign policy and economy of the United States. President Carter ordered blocking all

property and interests in property of the Government of Iran which are within the possession or control of persons subject to the jurisdiction of the United States.

9. In Executive Order 12205, issued on April 7, 1980, 45 Fed. Reg. 24099 ("E.O. 12205"), under the authority of inter alia, IEEPA and the NEA, President Carter implemented prohibitions in furtherance of the objectives of United Nations Security Council Resolution 461 (1979). The prohibitions included the sale, supply, or other transfer, by any U.S. person of any items, commodities, or products from the U.S. or any foreign country whether or not originating in the United States, either to or destined for Iran, an Iranian governmental entity in Iran, any other person or body in Iran or any other person or body for the purposes of any enterprise carried on in Iran.

10. In Executive Order 12211, issued on April 17, 1980, 45 Fed. Reg. 26685 ("E.O. 12211"), under the authority of, inter alia, IEEPA and the NEA, President Carter declared a national emergency due to the threat to the national security, foreign policy and economy of the United States. The prohibitions included an amendment to E.O. 12205 and imposed additional sanctions on dealings with Iran, including the prohibition of imports of goods from Iran and payments or transfers of funds or other property to any person in Iran.

11. In Executive Order 12282, issued on January 23, 1981, 46 Fed. Reg. 7925 ("E.O. 12282"), under the authority of, inter alia, IEEPA and the NEA, President Carter declared a national emergency due to the threat to the national security, foreign policy and economy of the United States, President Carter revoked the prohibitions contained in E.O. 12205 and E.O. 12211, and Proclamation 4702 in order to implement agreements with the Government of Iran, as reflected in Declarations of the Government of the Democratic and Popular Republic of

Algeria, relating to the release of U.S. hostages, the resolution of U.S. claims against Iran, and to begin the process of normalization of relations between the U.S. and Iran.

12. In Executive Order 12613, issued on October 30, 1987, 52 Fed. Reg. 41490 ("E.O. 12613"), under the authority of inter alia, the Constitution and laws of the United States, including section 505 of the International Security and Development Cooperation Act of 1985 ("ISDCA") (22 U.S.C. § 2349aa-9), and 3 U.S.C. § 301, President Reagan found that the Government of Iran was actively supporting terrorism as an instrument of state policy. President Reagan ordered that no goods or services of Iranian origin may be imported into the United States, to ensure that U.S. imports will not contribute financial support to terrorism or to further aggressive actions against non-belligerent shipping.

13. In Executive Order 12959, issued on May 9, 1995, 60 Fed. Reg. 24757 ("E.O. 12959"), under the authority of inter alia, IEEPA, NEA, ISDCA, and 3 U.S.C. § 301, President Clinton broadened the prohibition to include the importation/exportation/reexportation of goods/services of Iranian/U.S. origin, unless substantially transformed. President Clinton further prohibited any "new investment" by a U.S. person in Iran or in property owned or controlled by the Government of Iran.

14. In Executive Order 13059, issued on August 19, 1997, 62 Fed. Reg. 44531 ("E.O. 13059"), under the authority of inter alia, IEEPA, NEA, ISDCA, and 3 U.S.C. § 301, President Clinton clarified E.O. 12957 and 12959 confirming that virtually all exportation, reexportation, sale or supply of goods, technology, or services to Iran are prohibited. E.O. 13059 further prohibited any "new investment" by a U.S. person in Iran or in property owned or controlled by the Government of Iran and prohibited transactions related to goods or services of Iranian origin or related to goods, technology, or services to be exported, reexported, sold, or supplied to Iran.

15. In Executive Order 13599, issued on February 5, 2012, 77 Fed. Reg. 6659 ("E.O. 13599"), under the authority of inter alia, IEEPA, NEA, ISDCA, section 1245 of the National Defense Authorization Act for Fiscal Year 2012 (Public Law 112–81) ("NDAA"), and 3 U.S.C. § 301, President Obama, in furtherance of the national emergency declared in E.O. 12957, ordered any property and interests of the Central Bank of Iran, or of any Iranian government-controlled entity or Iranian financial institution, that come within the United States or controlled by U.S. persons to be blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in. U.S. persons are prohibited from any dealings with such entities.

16. OFAC has promulgated regulations to implement the above-noted Executive Orders. The regulations are found in 31 C.F.R. Part 560 (the "ITSR"), which bars most trade of goods, services and technologies between Iran and the United States, as well as new investments by U.S. persons in Iran and commercial funds transfers to or from Iran.

**FACTUAL BACKGROUND**

17. In 1973, Plaintiff invested in and obtained an ownership interest in Faratel, Inc. ("Faratel Iran"), an Iranian corporation with corporate address at Tehran, Enghelab Ave., Kandovan Alley No. 12, Iran. Plaintiff has maintained his ownership interest in Faratel Iran in varying degrees since 1973. Today, Faratel Iran has approximately 430 employees and ca. 300 contract workers and is in the business of manufacturing and selling electronic devices such as small 220V/50Hz uninterruptible power supplies ("UPS"), which are used for power surge suppression/protection/battery back-up in home computer and commercial settings (capable of servicing a maximum of only 10 networked computers at one time). Plaintiff is currently the majority shareholder and Chairman of the Board of Faratel Iran. He currently holds 55% of the

shares of Faratel Iran – an ownership interest which is valued in excess of $33,000,000.00 U.S. Dollars.

18.   When Plaintiff invested in Faratel Iran in 1973, Plaintiff had no expectation or reason to foresee that his investment would be at risk of a taking by the United States. The Iranian Revolution in 1979, the Iranian hostage crisis in 1979, and the subsequent deterioration of Iran-U.S. relations which led to the U.S. sanctions against Iran in 1979 were not foreseeable by Mr. Mechanic. Nor was Mr. Mechanic expecting to or able to foresee in 1973 that he would permanently move to the United States in 1985. Thus, Mr. Mechanic has a cognizable ownership interest in Faratel Iran that pre-dates and pre-exists not only OFAC's Iranian sanctions, but IEEPA as well (enacted Dec. 28, 1977). And, as early as 1986, the U.S. Government has been aware and has had knowledge of Mr. Mechanic's ownership interest in Faratel Iran.

19.   Plaintiff is also President and owner of Smart Power Systems, Inc. ("SPS"), a Texas corporation, with address at 1760 Stebbins Dr., Houston, Texas 77043. SPS was formerly named and known as I.E.P.S. Electronics, Inc. ("IEPS"), a Texas corporation, with address at 11391 Meadowglen, Suite F, Houston, Texas 77082. And prior to IEPS, the company was named and known as Faratel, Inc. ("Faratel USA"). This is a Texas corporation distinct and separate from Faratel Iran. SPS/IEPS/Faratel USA is a U.S. company manufacturing for sale in the U.S. small electronic products such as 120V/60Hz uninterruptible power supplies ("UPS"), automatic voltage regulators ("AVR"), and surge suppressors used in home computer and commercial settings (capable of servicing a maximum of only 2 networked computers at one time).

20. On or about April 17, 1996, Plaintiff, through his company, IEPS, sought legal advice from Givens & Kelly, a law firm in Houston, Texas. Plaintiff specifically sought legal advice as to whether Iranian sanctions enforced by the United States' Office of Foreign Assets Control (OFAC) at that time prohibited a prospective transaction whereby IEPS would sell foreign (non-U.S. origin) goods from an unrelated supplier in Taiwan to Faratel Iran. Givens & Kelly advised Plaintiff in writing that the transaction proposed by Plaintiff was permitted by the applicable law (i.e., OFAC's Iranian sanctions in place as of April 17, 1996).

21. According to U.S. District Court Judge Lee H. Rosenthal for the Southern District of Texas, in her Memorandum and Opinion in case no. H-98-2672, dated August 9, 2000, special agents with the U.S. Customs Service ("Customs") began conducting a federal investigation on or about June 6, 1996, into IEPS's activities involving Faratel Iran. This investigation was unbeknownst to Plaintiff until March 26, 1997.

22. On or about March 26, 1997, Customs agents obtained and executed a search warrant for all records and documents located in IEPS's office involving the falsely alleged brokering of the sale of electronic parts at IEPS from foreign suppliers to Faratel Iran. In connection with this warrant, Customs seized approximately $103,214.20 of funds in IEPS's bank accounts. These funds were ultimately returned by the court upon its finding in the above-referenced case no. H-98-2672 that the U.S. government had violated IEPS's due process rights.

23. On or about July 23, 1997, the United States Attorney's Office ("USAO") notified Customs that the USAO had decided to decline criminal prosecution against Mr. Mechanic respecting his involvement in Faratel Iran and IEPS transactions, citing various reasons including "the evidence developed in recent months would make it extremely difficult to prove beyond a reasonable doubt that Mechanic possessed the specific intent necessary in order to hold him

criminally liable" and "the fact that the goods are not of United States origin and implicate no issues of national security...."

24. On or about October 29, 1997, in a letter submitted by his legal counsel at Givens & Associates[1], Plaintiff requested advice from OFAC regarding the extent to which his oversight and direction over Faratel Iran (as an owner) was prohibited or permitted by OFAC's Iranian sanctions. In this request letter, Plaintiff also requested from OFAC a specific license authorizing his activities as owner of Faratel Iran, to the extent his activities were prohibited by OFAC's Iranian sanctions. Shortly thereafter, OFAC provided written acknowledgment of their receipt of Plaintiff's request letter. To the best of Plaintiff's knowledge, Plaintiff has not received and OFAC has not issued any decision in response to his October 29, 1997, letter requesting advice and a specific license, despite OFAC's acknowledging receipt of this letter.

25. On February 23, 2012, OFAC served Plaintiff with an administrative subpoena inquiring into Plaintiff's activities between 2006 and 2008, during which time Plaintiff received approximately 53 small shipments of various parts from Faratel Iran. These shipments consisted of sample items such as printed circuit boards, plastic covers, bracket screws, and the like, which Plaintiff would use in his spare time tinkering with designs for electrical power systems for his company SPS in Houston, Texas.

26. On April 6, 2012, Mr. Mechanic, through legal counsel at Givens & Johnston PLLC, filed a full response to OFAC's administrative subpoena detailing his activities involving Faratel Iran. Plaintiff has not received any response from OFAC respecting Plaintiff's administrative subpoena response, and he has not received any notification from OFAC that his activities involving Faratel Iran that were the subject of the subpoena must cease or were prohibited by the ITSR.

---

[1] Givens & Associates was the successor law firm to Givens & Kelly.

27. OFAC has never designated Faratel Iran or Mr. Mechanic as Specially Designated Nationals (SDNs) or Specially Designated Global Terrorists (SDGTs). OFAC has never listed Faratel Iran or Mr. Mechanic in its master list of SDNs and Blocked Persons. Furthermore, OFAC has never at any time claimed or asserted that Faratel Iran or Mr. Mechanic had any connection to, involvement in, or provided support to terrorist activities, or that his ownership and involvement with Faratel Iran posed a threat to the national security of the United States.

28. The ITSR referenced in Paragraph 1 clearly prohibited "new investments" in Iran, but it did not prohibit pre-existing ownership of businesses like Mr. Mechanic's ownership of Faratel Iran. The fact that pre-existing investments are excepted from the ITSR prohibitions implicitly allows for some form of reasonable oversight and direction by Plaintiff over his property.

29. Plaintiff's pre-existing ownership interest in Faratel Iran and ownership in any tangible and/or intangible business assets derived therefrom, i.e., real property, inventory, dividends, bank accounts, intellectual property, etc., constitute legally cognizable property interests. Due to the Defendant's recent enforcement of the ITSR against Mr. Mechanic (described in Paragraph 30), Mr. Mechanic has been substantially deprived of his pre-existing ownership interest, and the value thereof, in Faratel Iran and any other tangible and intangible business assets thereof.

30. On April 16, 2015, the USAO filed a criminal indictment in the U.S. District Court for the Southern District of Texas against Mr. Mechanic alleging that his activities as owner of Faratel Iran and SPS were prohibited under the ITSR. These activities alleged in the indictment were, to a somewhat lesser degree, similar to the activities described in Plaintiff's letter to OFAC dated October 29, 1997, requesting advice and a specific license.

31. Pursuant to the criminal action dated April 16, 2015, the Defendant has either seized, frozen, or blocked any assets involved in the alleged criminal acts, including business assets derived from his ownership interest in Faratel Iran. In initiating this criminal action, Defendant has also prohibited Plaintiff from conducting activities requisite to maintaining his pre-existing ownership interest in Faratel Iran, essentially depriving him of any and all economic use of this pre-existing ownership interest. The Iranian sanctions, without saying so directly, have been construed and enforced by the Defendant so as to prohibit Plaintiff from conducting activities requisite to maintaining his pre-existing ownership interest, and any value thereof, in Faratel Iran. In effect, he has been deprived of his ownership interest in Faratel Iran, and any value and assets thereof. Furthermore, the Defendant's acts and enforcement of the ITSR against Plaintiff has caused Faratel Iran's value to diminish significantly and permanently, due to Faratel Iran's inability to operate successfully without Plaintiff's ownership and maintenance of the company. For these reasons, Defendant's acts, and the underlying Iranian sanctions used as the basis for its acts, constitute a Fifth Amendment taking of Plaintiff's legally cognizable property interest.

32. The recent Joint Comprehensive Plan of Action ("JCPOA") reached between the P5+1 (United States, United Kingdom, France, Russia, China; plus Germany) and Iran on July 14, 2015, further confirms that the U.S. Government's taking of Plaintiff's property interest in Faratel Iran is a permanent taking, not a temporary taking. According to testimony by U.S. Secretary of the Treasury Jacob J. Lew to the U.S. Senate Foreign Relations Committee on July 23, 2015, the United States only intends to provide limited sanctions relief (e.g., nuclear-related secondary sanctions), leaving in place the primary trade embargo and sanctions against Iran (i.e.,

those used as the basis for the U.S. Government's taking of Plaintiff's property interest in Faratel Iran).

33. Plaintiff did not receive just compensation from the United States for its taking of his valuable cognizable property interest in Faratel Iran; therefore, the United States violated the Takings Clause under the Fifth Amendment of the U.S. Constitution.

## CAUSE OF ACTION

**COUNT ONE: UNCONSTITUTIONAL TAKING WITHOUT JUST COMPENSATION**

34. Plaintiff re-alleges and incorporates by reference paragraphs 1-33.

35. The Takings Clause of the Fifth Amendment prohibits the taking of private property for public use without just compensation.

36. Plaintiff seeks just compensation from Defendant as a result of the taking of his property i.e. valid, judicially cognizable claims of ownership interest in Faratel Iran, any value thereof, and any tangible or intangible assets thereof. Consequently, the United States' actions are takings of private property for public use, without just compensation, in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution.

## REQUEST FOR JUDGMENT AND RELIEF

37. Plaintiff re-alleges and incorporates by reference paragraphs 1-36. Plaintiff seeks compensation from Defendant for the taking of private property for public use without just compensation.

38. Plaintiff is entitled to just compensation as a result of the taking of his property, i.e., valid, judicially cognizable claims of ownership interest, and any value or assets thereof, of Faratel Inc. located in Tehran, Iran.

WHEREFORE, Plaintiff prays for judgment against the Defendant, the United States, as follows:

A. Recovery in the amount to be determined at trial, but expected to exceed the sum of $33,000,000.00 U.S. Dollars, representing just compensation for the taking of Plaintiff's legally cognizable ownership interest in Faratel Iran, together with prejudgment and post judgment interest, costs, and attorneys' fees; and,

B. Such further relief as the Court deems just and proper.

Date: 8-4-15

Respectfully submitted,
BERG & ANDROPHY

Joel Androphy
State Bar No. 01254700
S.D. Tex. 53457
Berg & Androphy
3704 Travis Street
Houston, Texas 77002
Telephone 713-529-5622
Fax 713-529-3785
Attorney for Plaintiff
Email: jandrophy@bafirm.com